# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DARLENE BRAND,**

**Plaintiff,**

-vs-                                                         **Case No.  6:10-cv-1777-Orl-19KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by

Darlene Brand, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

(SSA).  Doc. Nos. 11, 12.  This case was referred to me for issuance of a Report and

Recommendation.

## I.      PROCEDURAL  HISTORY.

In April  2008, Brand applied for disability benefits under the Federal Old Age, Survivors

and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the Supplemental

Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*.,

(sometimes referred to collectively herein as the Act).  R. 145-50.  She alleged that she became

disabled on March 31, 2005.  R. 145, 149.  Brand's applications were denied initially and on

reconsideration.  R. 61-72.

Brand requested a hearing before an administrative law judge (ALJ).  R. 84.  An ALJ held

a hearing on April 1, 2010.  R. 26-60.  Brand, represented by an attorney, testified at the hearing.

Melissa T. Brooks, a vocational expert (VE), also testified.  R. 51-58.

After considering the testimony and the medical evidence presented, the ALJ determined

that Brand was insured under OASDI through September 30, 2008.  R. 13.  The ALJ found that

Brand had not engaged in substantial gainful activity since March 31, 2005, the alleged onset date

of her disability.  R. 13.

The ALJ concluded that the medical evidence showed that Brand had the following severe

impairments:  lumbar and cervical disc bulges and headaches.  R. 13.  These impairments did not

meet or equal any of the impairments listed in the applicable social security regulations (the

Listings).  R. 14.

The ALJ concluded that Brand did not have a severe mental impairment because she

sought no mental health treatment, she was able to function at home with her son and

granddaughter and her conditions existed during the times when she was working.  R. 14.  The

ALJ did not make the findings required by the SSA regulations regarding Brand's limitations in

four areas of mental functioning.  However, the ALJ gave great weight to the opinion of reviewing

physicians, R. 18, two of whom opined that Brand had moderate limitations in concentration,

persistence and pace, R. 342, 362.

The ALJ found that Brand had the residual functional capacity (RFC) to perform light work[1] with a sit/stand option which involved no more than simple, one to two step tasks.  R. 14.  The ALJ found that Brand could not perform her past relevant work with this RFC.  R. 18.  Relying on the testimony of the VE, the ALJ concluded that Brand could perform the jobs of office helper, agriculture produce sorter and ticket taker, all of which were light, unskilled positions.  R. 19.  Therefore, the ALJ concluded that Brand was not disabled.  *Id.*

Brand requested review of the ALJ's decision.  R. 6.  On September 8, 2010, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 1-5.  Brand timely sought review of this decision by this Court.  Doc. No. 1.

## II.  JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) as adopted by reference in 42 U.S.C. § 1383(c)(3)..

## III.  STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental

---

[1]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567, 416.967.

impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

(1)     Is the claimant presently unemployed?

(2)     Is the claimant's impairment severe?

(3)     Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4)     Is the claimant unable to perform his or her former occupation?

(5)     Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are adequately set forth in the ALJ's decision and the parties' memoranda. Therefore, I will only summarize the relevant facts to protect Brand's privacy to the extent possible.

### A.    *Personal Information and Work History.*

Brand was born in 1961. R. 33. She completed the eighth grade. R. 34. She lived with her 30-year-old son and her preschool age granddaughter. R. 39.

In a Work History Report, Brand indicated that between June 2006 and August 20, 2006, she worked as a cashier 20 hours per week. R. 172. Between December 20, 2006 and February 20, 2007, she also worked as a cashier/stocker 20 hours per week. R. 171. She had previously worked as a cashier and a fast food worker. R. 53-54.

The VE testified that Brand's prior job of a fast food worker was an unskilled, light duty position. Her prior job of cashier-checker was a semi-skilled, light duty position, and her prior job of store laborer had been an unskilled, medium duty position. R. 52.

B.    *Medical Records.*

On March 2, 2005, Brand treated with G. Mikula, M.D. Brand complained of severe headaches, cervical pain and arthritic pain in her hands. Dr. Mikula's impression was anxiety, hepatitis C antibodies, cervical syndrome, arthritic hands and alcohol abuse. R. 438. On June 1, 2005, Brand did not appear for her appointment because she could not afford it. She was referred to the health department for hepatitis testing. R. 437.

Following a car accident on May 3, 2005, Brand began treating with Randall J. Rochester, B.S., D.C. R. 420-23. Dr. Rochester treated until August 30, 2005, when she reached maximum medical improvement with a 13% whole body impairment and an 80% improvement in her symptoms. R. 405.

On May 17, 2005, Frank S. Alvarez, Jr., M.D., performed a neurological evaluation based on reports of neck and back pain and headaches following the car accident. R.396-99. Brand described her headaches at pain level 10 out of 10 accompanied by nausea, lightheadedness, blurred vision and dizziness that lasted 20 seconds. Her neck pain was also 10 out of 10 and caused numbness and tingling in her arms. Her pain was aggravated by lying down, use of her arms, movement in her neck, or walking or sitting for prolonged periods. Pain also radiated into her left shoulder and was aggravated by use of her left shoulder. She had throbbing and stabbing low back pain at a level 10. She had numbness and tingling into her legs. The pain was

aggravated by lying down, using her legs, bending, twisting, turning or walking and sitting. R. 396. Examination revealed decreased cervical range of motion, left shoulder pain and decreased lumbar range of motion. R. 397. Dr. Alvarez diagnosed a cervical strain, thoracic strain, left shoulder strain, lumbar strain with bilateral paresthesias (abnormal sensation such as tingling, burning or numbness) and sensory changes and posttraumatic headaches. R. 398. He prescribed Lortab for pain and recommended further testing. R. 399.

Brand treated with Dr. Alvarez again on June 14, 2005. She had daily headaches with nausea, vomiting and blurred vision. R. 388. She had neck pain and back pain and fell on the floor once when her leg went numb. R. 388-89. She stopped taking Lortab because it was expensive and made her itchy. R. 389. She tried over the counter pain medications but they did not help. R. 389. An MRI of the lumbar spine showed lumbar levoscoliosis with lumbar hyperlordosis. She had a bulging disc at L4-5 and a bulging disc with facet arthropathy at L5-S1. R. 390, 392-93. A cervical spine MRI showed cervicothoracic levoscoliosis (curved spine), straightening of the upper cervical lordosis, bulging discs at C3-4, C4-5 and C5-6 and spondylosis at C5-6. R. 390, 394-95. A cervical spine x-ray was unremarkable. R. 390. A lumbar spine x-ray showed hypertrophic facets in the lower lumbar spine and a left shoulder x-ray showed down sloping acromion. R. 390. An EMG nerve conduction study showed no evidence of cervical or lumbar radiculopathy. R. 390. He prescribed Ibuprofen and Imitrex for her headaches. R. 391.

Dr. Mikula diagnosed cervical and lumbar radiculopathy and hepatitis C on July 12, 2005. R. 435.

As of July 13, 2005, Brand reported headaches, back pain and neck pain at a level 8 out of 10. She never filled her prescriptions for Ibuprofen or Imitrex due to the cost, but was taking Percocet from another doctor which helped. She also took over the counter Motrin which also helped. R. 384-85. She had reached maximum medical improvement and was assigned a 5% impairment for headaches, a 5% impairment for cervicothoracic injury and a 5% impairment for lumbosacral injury, giving her a 15% impairment of the whole body. R. 387. Dr. Alvarez noted she would have ongoing symptomatology and likely future exacerbations. R. 387.

Dinash Yanamadula, M.D., evaluated Brand on August 19, 2005. An MRI showed a C5-6 disc bulge. A lumbar spine MRI was normal. She complained of pain at a level 8 out of 10. Brand had numbness in her hands and intermittent pain radiating down her legs. R. 380. Dr. Yanamadula diagnosed possible cervical radiculitis, a herniated cervical disc and lumbosacral radiculitis. R. 381. Brand did not want to undergo epidural steroid injections. Dr. Yanamadula prescribed a Medrol Dosepak. R. 381.

On November 2, 2005, Dr. Mikula noted that Brand was grieving her son's death in a car accident. Dr. Mikula refilled her prescriptions. R. 434.

Brand reported headaches, neck and back pain to Dr. Alvarez on December 2, 2005. She had run out of Percocet four months prior and started taking Lortab again, which helped and did not cause itching. She also took Bufferin which helped the pain. Dr. Alvarez advised her to continue the Lortab, obtain a thoracic MRI and see another pain doctor. R. 382-83.

On November 2, 2006, Brand slipped getting out of the bathtub and had back and neck pain. R. 433. Dr. Mikula prescribed medications. *Id*.

On January 19, 2007, Brand reported neck and right arm pain from her car accident. Dr. Mikula diagnosed grieving and insomnia and noted that Brand was not taking Prozac as prescribed. Dr. Mikula prescribed Xanax. R. 431. On April 27, 2007, Brand was tearful discussing her son. Dr. Mikula diagnosed depression and prescribed pain medications and a muscle relaxant and increased the dosage of Prozac. R. 430.

On July 2, 2007, Brand presented to the emergency room complaining of low back pain for four days. She was diagnosed with a muscle strain and the doctor indicated she said she had plenty of pain medication and muscle relaxants. R. 273. On July 2, 2007, she was diagnosed with low back pain and a urinary tract infection. She was prescribed pain medication. R. 272.

On November 1, 2007, Brand complained of nausea and low abdominal pain and was diagnosed with gastroenteritis and given Valium. R. 279-83. A CT scan did not explain her symptoms. R. 284.

Brand was treated at Halifax Health Medical Center on May 19, 2008 for pain in her abdomen. R. 290. She had nausea and vomiting since November of 2007. Moderate pain radiated to her back and shoulders. She had gained forty pounds in eight months. R. 291. She was prescribed Phenergan, Lortab and Prilosec. R. 294.

On May 27, 2008, Dr. Mikula again diagnosed depression and noted weight gain probably secondary to the depression. Dr. Mikula prescribed additional medications, including Lortab. R. 429.

Julie L. Parker, Psy. D., completed a neuropsychological evaluation on June 23, 2008. R. 306-08. Brand reported that she was in pain all the time, had mood swings and could not work

with people. R. 306. She had not received treatment for her hepatitis C because she could not

afford it. She was experiencing severe and prolonged bereavement due to the death of her 16-

year- old son. R. 306. She reported that she became unable to work after her son's death in

December 2005. R.306. She complained of abdominal pain, arthritis, chest pain, headaches,

kidney problems and vomiting. She had been prescribed Xanax to sleep and Lortab. R. 306. She

acknowledged suicidal ideations, insomnia, poor appetite despite weight gain and was tired all the

time. She was depressed and tearful throughout the evaluation. R. 307. She reported taking her

medications as prescribed. R. 307. She denied any significant legal history. R. 307. She was

homeless and living out of her car. R. 307.

Dr. Parker opined that Brand appeared to function in the below average range of

intellectual ability. Her insight and judgment were poor. R. 307. Her current Global Assessment

Functioning (GAF) score was 50 and her GAF for the past year was 45.[2] R. 308. Dr. Parker

stated that there did not appear to be any cognitive or physical impairments that would impede

Brand's ability to perform activities of daily living although she had some decreased independent

functioning because of her homeless status. Her concentration, persistence and pace were

"reportedly impaired." R. 308. Dr. Parker stated that Brand would need psychiatric and medical

treatment to improve her employability and vocational training. R. 308.

---

[2]  The Global Assessment of Functioning (GAF) scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th Ed. 1998) (hereinafter *Synopsis of Psychiatry*). A GAF rating of 41-50 reflects "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* at 299.

Alvan Barber, M.D., performed an independent medical evaluation on July 2, 2008. R. 310-16. Brand described back pain and neck pain and stiffness in the morning. She took pain medications and medication for anxiety. She estimated that she could walk 10 minutes, stand 10 minutes, sit 30 minutes and lift 10 pounds. R. 310. She was taking Xanax, Prilosec, Lortab and Prozac. R. 311. Dr. Barber observed that Brand walked with a slow, guarded gait, was unable to walk on her toes or heels and was unable to squat. R. 313. She had no memory deficit, no signs of depression, and her cognitive function was adequate. R. 313. She had limited range of motion in her cervical and lumbar spine. R. 314. He diagnosed hepatitis C, unmedicated; lumbar DSD with low back pain; depression, unmedicated; anxiety, medicated; tobacco abuse; and obesity. R. 313. Dr. Barber noted that Brand could be limited in walking for long periods of time and in lifting and carrying heavy objects. Her symptoms could be exacerbated by her excessive weight. She could perform upper body movements and coordinated activities with her hands. R. 313.

Nicolas Bancks, M.D., completed a Physical Residual Functional Capacity Assessment on July 15, 2008, after review of Brand's records. Dr. Bancks indicated that Brand could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk about 6 hours in an 8 hour workday, with unlimited pushing and pulling. R. 321. She could frequently climb ramps or stairs, kneel and crawl. She could occasionally climb ladders/ropes/scaffolds, balance, stoop and crouch. R. 322. She should avoid exposure to fumes, odors, dusts, gases, poor ventilation and to hazards. R. 324.

Angeles Alvarez-Mullin, M.D., completed a Mental Residual Functional Capacity Assessment on July 17, 2008 after review of Brand's records. Dr. Alvarez-Mullin indicated that

Brand was moderately limited in the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to set realistic goals or make plans independently of others. R. 328-29. Brand would be able to perform simple tasks and maintain a work schedule independently, could work in coordination with and in proximity to others, was able to interact with the public, supervisors and coworkers despite her preference for isolation and would be able to identify normal hazards and take normal precautions. She would benefit from mental health services. R. 330.

Dr. Alvarez-Mullin also completed a Psychiatric Review Technique form. R. 332-44. Dr. Alvarez -Mullin found that Brand had a mood disturbance, bereavement disorder and a depressive disorder, not otherwise specified. R. 335. She had mild restrictions in activities of daily living, maintaining social functioning, and moderate restrictions in maintaining concentration, persistence or pace. R. 342.

Blood tests on July 29, 2008, showed Brand had hepatitis C. R. 347.

Brand was treated in the emergency room on October 31, 2008 for a broken ankle after slipping in her laundry room. R. 441-50.

Gary Buffone, Ph.D., completed a Mental Residual Functional Capacity Assessment on November 12, 2008 based on review of Brand's medical records. R. 348-50. He indicated that Brand was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. R. 348. She was also moderately limited in her

ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 349. He noted she may have difficulty with tasks involving sustained focus and complex mental demands but remained mentally capable of carrying out simple instructions and tasks as reflected in the activities of daily living. R. 350. He also found that Brand had mild restrictions on her activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence and pace. R. 362.

Donald Morford, M.D., completed a Physical Residual Functional Capacity Assessment on November 21, 2008 based on review of Brand's records. R. 366-73. Dr. Morford indicated that Brand could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit, stand and/or walk about 6 hours in an 8 hour workday, with unlimited pushing and pulling. R. 367. She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. She should never climb ladders, ropes or scaffolds. R. 368. She should avoid concentrated exposure to hazards. R. 370.

Brand treated in an emergency room on April 18, 2009 for abdominal pain, pain in her back and neck, numbness in her arms and an inability to swallow. R. 374. She was diagnosed with abdominal pain, cervical radiculopathy and paresthesias. R. 374.

In a letter dated March 23, 2010, Daniel A. Warner, M.D., indicated that Brand had a spontaneous eradication of her hepatitis C. She would always be antibody positive but she did not have active chronic hepatitis C. R. 440.

-14-

*C.      Vocational Evaluation.*

On December 31, 2009, Elaine Harger completed a vocational evaluation.  R. 261-67.

Harger observed that Brand worked with low work energy and limited sedentary stamina in

completing her vocational paperwork.  She worked in 15 to 30 minute blocks and then required a

break.  She remained on task but had diminished focus.  She was tearful and had difficulty

recalling information.  R. 261.  She wanted to work 20 hours per week and wanted work that was

quiet and not too strenuous or stressful.  R. 262.

Brand reported a history of difficulty coping with life which was worsened by her son's

death.  She had not taken medications since January of 2009 because she could not afford them.

R. 262.  She reported difficulties tolerating noise and odors, breathing, turning or bending her

neck, numbness in her fingertips, sitting or standing longer than 15 minutes, balancing, stooping,

squatting, climbing a ladder, crawling, walking on uneven ground or taking stairs, driving, dealing

with hot or cold, making decisions, controlling her temper, ignoring distractions, relaxing,

concentrating and remembering.  R. 263.  Brand described her strengths as being punctual and

getting along well with others.  R. 267.

Based on test results, Harger opined that Brand had a written expression disorder, reading

disorder and mild mental retardation.  R. 266.  Harger found that due to her physical and

emotional difficulties, Brand did not appear ready to return to her prior employment or pursue

competitive employment.  Harger stated, "Until her medical and emotional limitations can be

addressed, she is best served by continuing her pursuit of SSDI."  R. 267.

*D.*     *Claimant's Testimony.*

As early as 1986, Brand has been taking medication for anxiety, panic attacks and nervousness. R. 36. A family doctor prescribed her the pills. *Id*.

As a result of her car accidents, she had trouble bending, lifting and with a lot of walking. R. 37. Her neck and back hurt and she could not sit still for a long time. *Id*. Her pain went from her neck to her back. R. 44. She had sharp pains in her legs and her arm, and her right arm was continuously numb. R. 44. She had sharp pain in her back when she tried to be active. R. 44. Her pain was an 8 on a scale of 1 to 10. R. 44-45. Her leg would go numb as well and she believed she broke her ankle because of the numbness. R. 45. She had not been back to see Dr. Alvarez because she could not afford treatment or medications, although she felt she still needed treatment. R. 37-38, 43, 45.

She had headaches all the time, at least six times per week. R. 46. She would lay down, close her eyes and use warm or cold rags to help the pain. R. 46-47.

She helped her son take care of his daughter. R. 40. She fixed breakfast for her granddaughter, taught her to ride her bike and walked with her. R. 40-41. Some days she did not feel like doing anything. If her son was not at home, she would make lunch for her granddaughter. R. 41. She read books and watched television with her granddaughter. R. 41. Her son did all of the household chores. R. 42. She could drive but had two accidents in the past two years. R. 42.

She had trouble with her memory and would write herself notes. R. 49. She thought the difficulty was connected to her son's death and her nerves. She had difficulty staying on task and would do several things at once. Due to depression, some days she would not get out of bed or get

dressed. She did not leave the house every day and did not have any friends or socialize. R. 50.
She had stayed in the house for weeks at a time and cried a lot. R. 50-51.

When she was around a crowd of people, she would have a panic attack. She would shake,
her heart would beat hard, she could not swallow and she would become nauseous. Her last panic
attack lasted twenty minutes. R. 47. She did not like to go to the grocery store so her son did the
shopping. She could not work if she had to have contact with the public because of her nerves and
panic attacks. R. 48.

Brand testified that she looked for jobs and had tried to work at simple jobs but nobody
was hiring. R. 35. She tried to work for Goodwill but she had difficulty obtaining a job due to a
prior incarceration in 1986 arising from possession of prescription drugs. R. 36.

D.    *Vocational Expert Testimony.*

The ALJ asked the VE the following hypothetical questions:

[P]lease for both hypotheticals consider a younger individual with eighth grade
education who has the previous work that you described as unskilled light. And for
the first hypothetical, I'm going to accept and describe to you what I believe the
Claimant has testified about and it mainly goes in my belief to the ability to
persistently have pace and have concentration. She has indicated that she gets
panic attacks and that there are days where she does not even get up and change out
of clothes. That she is subject to mood swings and certainly still grieving the death
of her son. If someone for emotional reasons is unable to attend a job 8 hours a
day, 40 hours a week or while at the job maintain concentration, pace and
persistence sufficient to do the job on a daily basis, can they be competitively
employed at all?

R. 55. The VE responded that such a person could not be competitively employed. *Id.*

Then the ALJ asked the following hypothetical:

For the second hypothetical, I would like you to consider jobs that are light duty
with a sit/stand option, simple one/two-step type jobs.

-17-

R. 55. The VE responded that the hypothetical person would not be able to return to the cashier-checker position. R. 55. However, the VE testified that the individual could perform the jobs of office helper, agriculture produce sorter and ticket taker which were all unskilled, light duty jobs available in the national economy. R. 55-56. The VE clarified that these jobs could be performed with a sit/stand option. R. 56.

## V.   ANALYSIS.

Brand asserts several grounds supporting reversal. Brand contends that the ALJ improperly disregarded Dr. Parker's opinion and did not apply the correct legal standards in the assessment of her mental functional capacity. She asserts that the ALJ failed to incorporate all of her impairments into the hypothetical questions to the VE. Finally, she contends that the ALJ did not apply the correct legal standard in assessing her credibility.[3]

I address in detail the assessment of Brand's mental functional capacity, because I find it to be dispositive. All of the professionals who made mental functional capacity assessments of Brand concurred that she had limitations in concentration, persistence and pace. Dr. Parker, who completed a neuropsychological examination of Brand on June 23, 2008, opined that Brand appeared to function in the below average range of intellectual ability. Her insight and judgment were poor. Her GAF scores reflected serious impairments. Dr. Parker found that Brand's concentration, persistence and pace were "reportedly impaired." R. 308. Dr. Alvarez-Mullin and Dr. Buffone, both of whom assessed Brand's mental functional capacity based on a review of her

---

[3] The parties were advised in the Court's scheduling order that any issues not specifically raised would be considered to have been waived. Doc. No. 13 at 2.

records, found that Brand had moderate limitations in concentration, persistence and pace.

Despite these consistent opinions of the medical professionals, the ALJ concluded that Brand did

not have a severe mental impairment at step two of the sequential evaluation.

The Commissioner argues that any error in the assessment of Brand's mental impairment

at step two is harmless because the ALJ found other severe impairments. *See Jamison v. Bowen*,

814 F.2d 585, 588 (11th Cir. 1987). This argument is correct only if the ALJ adequately

considered the functional limitations of Brand's mental impairment at later steps of the sequential

analysis. *Id.*

At later steps of the analysis, the ALJ gave great weight to the opinions of the reviewing

professionals, finding those opinions "consistent with one another and with the record on the

whole." R. 18. The ALJ did not explain, however, why she did not include moderate limitations

in concentration, persistence and pace in her assessment of Brand's mental functional capacity in

light of the opinions of reviewing professionals Drs. Alvarez-Mullin and Buffone that Brand had

moderate limitations in concentration, persistence and pace.

The Commissioner argues that the ALJ incorporated limitations on concentration,

persistence and pace in her RFC finding by indicating that Brand could perform work involving

no more than simple, one to two step tasks. The ALJ never explains, however, why she included

this limitation in her RFC finding or why a limitation to simple, one to two step tasks would be

adequate to address Brand's limitations in concentration, persistence and pace. For example, a

limitation to simple, one to two step tasks does not appear to address Drs. Alvarez-Mullin and

Buffone's opinions that Brand would be moderately limited in the ability to complete a normal

workday and workweek without interruptions from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods.

The record shows that limitations in the ability to complete a normal workday and workweek and work at a consistent pace are an important consideration at step five of the sequential evaluation. When the VE was asked to assume an individual who could not attend a job 8 hours a day, 40 hours a week or maintain concentration, persistence and pace sufficient to perform a job on a daily basis, the VE opined that there would be no jobs that individual could perform. The VE's testimony further illustrates why it is essential that the ALJ explain the basis of her conclusion that the only functional limitation arising from Brand's mental impairments was a limitation to simple, one and two steps tasks. Without this explanation, the Court has insufficient information to determine whether the ALJ's decision is supported by substantial evidence and consistent with the governing law. *See, e.g., Millhouse v. Astrue*, No. 8:08-cv-378-T-TGW, 2009 WL 763740, at * 2-4 (M.D. Fla. March 23, 2009).

Because the record is insufficient to determine whether the ALJ's decision is supported by substantial evidence and correct application of the law, remand for further proceedings is required. On remand, the Commissioner should address with specificity Brand's physical and mental impairments and explain why the residual functional capacity adequately addresses each of those impairments. The Commissioner must apply the Eleventh Circuit standard for addressing Brand's testimony about her functional limitations, including limitations arising from subjective complaints including headaches and pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). In assessing the impact of failure to seek mental health treatment, the Commissioner must

take into account the evidence that Brand could not afford medical care.  Finally, hypothetical questions to the vocational expert must contain all of Brand's functional limitations arising from physical and mental impairments and other subjective symptoms that the ALJ finds to be credible in light of the evidence as a whole.

## VI.    RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** under sentence four of 42 U.S.C. § 405(g), and **REMANDED** for further proceedings consistent with the Court's order.  I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its order on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on January 19, 2012.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy